UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
PEARLINE O. LIBURD and                            :
THE UNITED STATES OF AMERICA,           :
                                                                        :
                                          **Plaintiffs,**       :     **07 Civ. 11316 (HB)**
                                                                        :
                      -against-                              :     **OPINION & ORDER**
                                                                        :
**BRONX LEBANON HOSPITAL CENTER,**      :
**ANDREAS EVDOKAS individually and as**   :
**Administrative Director, RAYMOND,**      :
**ESTEVES individually and as Assistant Vice**  :
**President of Clinical Services,**                       :
                                                                        :
                                         **Defendants.**       :
------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., United States District Judge:**

        Defendants Bronx Lebanon Hospital Center ("Hospital"), Andreas Evdokas ("Evdokas") and Raymond Esteves ("Esteves") (collectively, "Defendants") move for summary judgment on each of the remaining claims brought by Plaintiff Pearline O. Liburd ("Plaintiff"). The remaining claims are for discrimination based on race/color under Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981; hostile work environment under Title VII and § 1981; and retaliatory termination in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"). For the reasons set forth below, Defendants' motion is granted.

## I. FACTUAL BACKGROUND[1]

        Plaintiff began her employment at the Hospital in October 1994; in February 1997, she was promoted to Project Administrator of the Harm Reduction Program ("HRP") and was thereafter promoted to Program Director. Plaintiff's duties included management and oversight of HRP and contribution to HRP's annual grant application process. At the time of her termination, Evdokas was Plaintiff's direct supervisor. Evdokas's direct supervisor was Esteves, who in turn was directly supervised by Dr. Jeffrey Levine, Chief of the Department of Psychiatry. The HRP was a fully funded federal grant program whose mission was to serve the HIV/AIDS and substance abuse population of the Bronx. In 2002, HRP was transferred from the Department of Medicine under Dr. Edward Telzak to the Department of Psychiatry under Dr. Levine. Final decision-making authority relating to HRP thereafter rested concurrently with Dr. Telzak, Dr. Levine and Esteves.

---

[1] Unless otherwise indicated, this section is based on Plaintiff's Response to Defendants' Rule 56.1 Statement.

**Plaintiff's Differences with Esteves**

Esteves gave Plaintiff at least one positive evaluation in 2002, and while under his supervision Plaintiff received salary increases in 2002, 2003 and 2005. Plaintiff and Esteves got along well and had no disputes prior to February 2005. At that time, Plaintiff and Esteves began to have "issues" relating to the best use of HRP's grant budget. Specifically, Plaintiff sought to use available funds for HRP staff overtime; Esteves disagreed and decided to use the funds to purchase computers. Esteves never informed Plaintiff of his decision to purchase the computers and ordered them without consulting her. Twelve computers were purchased; eight were designated to establish a computer lab in the HRP, while four were earmarked for HRP staff. The computers designated for the computer lab were not put to their intended use, and remained in the Hospital. Esteves never provided Plaintiff with the specific location of the eight computers; she thereafter developed concerns about their location and whether they would be delivered to HRP.

It is undisputed that the only complaint Plaintiff ever filed pursuant to the Hospital's complaint procedures was a memo addressed to Dr. Levine, dated October 18, 2005 (the "October 2005 memo"). In that memo, Plaintiff complained that Esteves had denied her request to attend a conference and described her disagreement with Esteves regarding the use of funds. The October 2005 memo made no mention of discrimination on the part of Esteves or any other supervisor at the Hospital, nor did it allege any fraud relating to the purchase of the computers. In the spring of 2006, Plaintiff began to take "aggressive action" to learn the location of the computers. After Plaintiff questioned Esteves repeatedly as to the computers' location, she claims that he began "devising a method to terminate" her. After these disagreements, Plaintiff's relationship with Esteves deteriorated and Esteves allegedly began to discriminate against her. Specifically, Plaintiff alleges that Esteves took the following actions: (1) ignored and spoke to her harshly at meetings; (2) scolded her for not following the chain of command in seeking consent to attend a conference; (3) threatened transfer to another department; (4) denied transfer to the supervisor of her choice; (5) gave her extra duties in HRP; (6) stripped her of certain duties; (7) referred to her as "black ass" on three occasions; (8) closely monitored her; (9) gave unrealistic time periods to close patient files; (10) eliminated programs in the HRP that Plaintiff had implemented, including the Acupuncture Program, Saturday Program and Friday Free Breakfast program; (11) declined to

2

rebid for HRP; and (12) ultimately terminated Plaintiff and replaced her with Jennifer Marciano, a white female.[2]

**Plaintiff's Use of Telephones and Subsequent Termination**

The Hospital's "Computer and Other Electronic Equipment Policy" states that all use of electronic equipment, including telephones must be business-related or otherwise authorized. In April 2006, an audit conducted by Sharon Thompson, the Hospital's Telecommunications Department manager, revealed that during the period January 1 to March 31, 2006, Plaintiff's extension was among those with the 100 most expensive calls. In fact, Plaintiff's call log showed almost $6,000 in calls, over $3,000 of which consisted of long-distance calls largely to Plaintiff's native country of Nevis and to St. Kitts. The audit was conducted without notice to or input from Plaintiff's supervisors.[3] Plaintiff claims that she had permission to make such calls from a previous supervisor no longer at the Hospital, and that she conducted Hospital business in Nevis. She also insists that others made the calls, as her extension is not blocked from making long-distance calls.

On or about May 8, 2006, Jasen Nhambiu, Director of Labor Relations, a black male, reviewed Plaintiff's call log, and contacted Plaintiff and gave her an opportunity to explain it. Plaintiff did not deny making the calls, and claimed that they were made to HRP patients and in furtherance of her volunteer outreach efforts. Plaintiff conceded that she did not have permission from her current supervisors to make these calls. Plaintiff was given the opportunity to confirm her claim that the calls were business-related by producing documentation, but she was unable to do so. Moreover, Mr. Nhambiu attempted to call some of the long-distance numbers listed on Plaintiff's call log, and none of the individuals contacted would confirm any affiliation with the

---

[2] Plaintiff and Marciano were told together in an October 2005 meeting that all grant-funded programs were required to close out patient files and that she did not feel at the time that this directive was discriminatory. Defs.' Local Rule 56.1 Statement ¶ 22. Furthermore, although the acupuncture treatment component of HRP was successful, the program was eliminated in early 2006 because the licensed acupuncturist who had been affiliated with the program left the Hospital. Id. ¶ 23. The Friday Free Breakfast program was eliminated due to low attendance and the Saturday Program was eliminated because the Hospital could no longer financially justify paying required overtime for a security guard. Id. ¶ 24-25. Finally, on or about May 5, 2006, Dr. Telzak reviewed HRP patient records and decided that HRP's patient population was too low and other programs were available to service similar needs; accordingly, he decided not to rebid for HRP. Plaintiff was advised of the decision to close HRP that same day, and she expressed how "upset" she was at the closing of what she viewed as being "her" program. After Plaintiff's termination in May 2006, Marciano was charged with oversight of HRP's closing, which consisted largely of paperwork relating to the closing. In February 2007, after HRP closed, its entire staff was let go, with the exception of Francis Aseidu, a black male.

[3] Plaintiff alleges that her supervisors must have been involved in the telephone audit because at the same time, she was pressuring Esteves regarding the location of the computers, and that Esteves went on a "witch hunt" to find a reason to terminate her. Thus, she contends it is "no coincidence" that the telephone records came up at this time or that no other program directors' records were produced. The Court need not consider these portions of Plaintiff's Rule 56.1 Statement, as they are wholly conclusory and unsupported by facts in the record.

Hospital. After Plaintiff's termination, at her unemployment hearing, Plaintiff created a list of Hospital patients that she contended were located in the Caribbean and could account, at least in part, for the long-distance calls on her Telephone Usage Report. It was ultimately determined that none of these patients was located in the Caribbean, nor were they patients or clients of the HRP.[4]

The Hospital terminated Plaintiff's employment effective May 12, 2006 due to her telephone policy violation; Evdokas ultimately relayed the termination decision to Plaintiff. Three other Hospital employees whose violation of the telephone usage policy was revealed by Ms. Thompson's investigation were also terminated in approximately the same time frame.

### III.  PROCEDURAL HISTORY

Plaintiff filed a Complaint on December 17, 2007 and an Amended Complaint on April 30, 2008.[5] The Hospital filed a motion to dismiss and on August 18, 2008, the Court dismissed Plaintiff's age, gender and constitutional claims in their entirety; all claims arising from acts that occurred prior to December 21, 2005 as time-barred; all of Plaintiff's claims against Evdokas; and all Plaintiff's Title VII claims against Esteves. Plaintiff's remaining claims are for race/color discrimination and hostile work environment under Title VII and § 1981, and for FCA violation.

### IV.  DISCUSSION

**A.    Legal Standard on a Motion for Summary Judgment**

A motion for summary judgment must be granted if the moving party shows "there is no genuine issue as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In showing the existence of a genuine issue of material fact, "the non-moving

---

[4] For reasons unclear to the Court, Plaintiff insisted that these names supported her claim that the calls were business-related and could account for long-distance charges on her call log. She asked the Hospital to produce these individuals' patient files, asserting that the files would reveal that they were the people she called. The files were turned over to Magistrate Judge Francis for *in camera* review. Judge Francis found that none of the individuals on Plaintiff's list was located in either Nevis or St. Kitts. Further, Judge Francis found that none of the individuals was a client of HRP. Thus, Judge Francis entered an order, dated March 25, 2009, that Defendants need not produce the files. (Docket No. 67). Plaintiff's claim that these names proved her calls were business-related is then plainly controverted by the documents themselves, and there is no other evidence that the calls were authorized.

[5] The Amended Complaint added a cause of action for violation of the FCA and, as is required under the Act, added the United States of America as a plaintiff. The United States subsequently declined to intervene in the action.

party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *Golden Pac. Bancorp v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir. 2004). Rather, she "must come forward with evidence sufficient to allow a reasonable jury to find in her favor." *Brown*, 257 F.3d at 252; *see also* Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in [the] rule, . . . the adverse party's response . . . must set forth *specific facts* showing that there is a genuine issue for trial.") (emphasis added). The facts presented must be in a form that would be admissible at trial. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Even if the parties dispute material facts, summary judgment must be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

Courts should be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). However, summary judgment in a discrimination case "may still be appropriate if the plaintiff relies on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." *Figueroa v. New York City Health & Hosps. Corp.*, 500 F. Supp. 2d 224, 228 (S.D.N.Y. 2007). "Indeed, the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trial – apply no less to discrimination than to commercial or other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("Trial courts should not treat discrimination differently from other ultimate questions of fact.").

**B.**     **Race/Color Discrimination Under Title VII and Section 1981**

Motions for summary judgment based on race discrimination under Title VII and Section 1981 are analyzed under the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Paulino v. New York Printing Pressman's Union, Local Two*, No. 07-2425-cv, 2008 U.S. App. LEXIS 24456, at *3-6 (2d Cir. Dec. 3, 2008) (applying *McDonnell Douglas* analysis to discrimination claims under Title VII and section 1981). Under the *McDonnell Douglas* analysis, the plaintiff must first establish a *prima facie* case of discrimination based on race by demonstrating that (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) that action occurred under

5

circumstances giving rise to an inference of discriminatory intent. 411 U.S. at 802.[6] After the plaintiff has satisfied this "minimal" initial burden, *see, e.g.*, *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004), the burden of going forward shifts to the defendant to provide a legitimate non-discriminatory reason for the adverse employment action. *Id.* This showing must be supported by admissible evidence that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. *Id.* The plaintiff then has an opportunity to demonstrate that the defendant's reasons were merely a pretext for discrimination. *Id.*.

Throughout this analysis, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Thus, even where plaintiff's evidence is sufficient to raise a question as to one part of the burden-shifting inquiry, the ultimate question is whether there is sufficient evidence for a jury to find that she was discriminated against because of her race. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 93-94 (2d Cir. 2001). Where a plaintiff has not met that burden, summary judgment is appropriate. Moreover, if a plaintiff fails to show the existence of a genuine issue of material fact with respect to the *prima facie* claim, summary judgment is appropriate on that basis alone. *See Carr v. WestLB Admin., Inc.*, 171 F. Supp. 2d 302, 306 (S.D.N.Y. 2001).

*1. Prima Facie Case*

Defendants do not dispute that Plaintiff has established the first three elements of the *prima facie* claim: she is in a protected class because she is black; she was qualified for her position; and her employment at the Hospital was terminated. Accordingly, the only element of the *prima facie* case that remains at issue is whether Plaintiff's termination occurred under circumstances that raise an inference of discrimination based on her race or color. Plaintiff argues principally that there is such an inference because Esteves referred to her as "black ass" on three occasions.[7] Defendants attempt to cast these comments as "stray remarks" that are insufficient to

---

[6] The demonstration of a *prima facie* case "in effect creates a presumption that the employer unlawfully discriminated against the employee." *Scaria v. Rubin*, 117 F.3d 652, 654 (2d Cir. 1997). However, the presumption raises an inference of discrimination "*only* because we presume these acts, if *otherwise unexplained*, are more than likely than not based on the consideration of impermissible factors." *Id.* (emphasis in original).

[7] Plaintiff also asserts that she was "replaced" by Marciano, a white woman. Marciano was tasked with overseeing the closeout of HRP after Plaintiff was terminated. She was not brought in to oversee HRP itself; HRP was being dismantled, and thus Plaintiff would not have retained that position even if she had not been terminated. Moreover, even if the so-called "replacement" of Plaintiff with Marciano for this discrete task could otherwise raise a genuine issue of fact regarding an inference of discrimination, any such issue is not material, as it is undermined by the context in which it arose, described in further detail below.

6

raise an inference of discriminatory intent.  I disagree – the use of a racial epithet such as "black ass" by a supervisor, such as Esteves was to Plaintiff, is demonstrably not "stray," and can, depending on the context in which it is used, be sufficient to raise an inference of discrimination.

The Second Circuit recently held that a remark may not be characterized as stray or not stray in order to conclude whether the statement creates an inference of discrimination.  *See Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115-16 (2d Cir. 2007).  Rather, the purpose of characterizing a remark as "stray" is "to recognize that all comments pertaining to a protected class are not equally probative of discrimination."  *Id.* at 115.  The remark must be considered in context – "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination," while "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be."  *Id.*  An important, though not determinative, factor is whether the remark was made by a person who is involved in the decision-making process with respect to the plaintiff.  *See, e.g.*, *Ostrowski v. Atlantic Mut. Ins. Co.*, 968 F.2d 171, 182 (2d Cir. 1992) (remarks were "stray" when made "in the workplace by persons who are not involved in the pertinent decisionmaking process"); *cf. Rose v. New York City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001) (contrasting "stray remarks of a colleague" with "comments made directly to" plaintiff by someone with "enormous influence in the decision-making process").  The temporal proximity of the remark to the adverse employment action is likewise a significant consideration.  *See Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 162-63 (2d Cir. 1998) (rejecting "stray" label where decision-makers used age-related remarks near time of plaintiff's termination); *Slattery*, 248 F.3d at 92 n.2 (characterizing remarks as "stray" where they were "unrelated to [the plaintiff's] discharge").

Based on these considerations and this fact pattern, I find that Esteves's use of the epithet "black ass" did not constitute a "stray" remark.  Esteves was the supervisor of Plaintiff's supervisor, putting him in a distinct decision-making position with respect to performance evaluations, salary and termination.  There appears to be a question of whether it was actually Esteves or Evdokas who made the ultimate decision to terminate Plaintiff, or whether it was instead Jasen Nhambiu.  Defendants assign significance to the distinction because they contend that if Esteves did not make the termination decision, his remarks must be characterized as "stray." I disagree.  Esteves had sufficient decision-making authority over Plaintiff to make his remarks quite relevant to whether there was a discriminatory animus involved in Plaintiff's termination. Accordingly, taken on their own, the "black ass" comments may well be sufficient to raise a

7

genuine issue of material fact.[8]  But, such comments must be considered in light of the circumstances surrounding Plaintiff's termination.  Viewed as such, I find that the "black ass" remarks do not raise an inference of discrimination.

First, the evidence shows that the demographic makeup of Defendants' workforce is overwhelmingly racially diverse.  As of May 2006, when Plaintiff was terminated, 88% of the Hospital's workforce was non-white, and 40% of the Hospital's employees were black.  In the Department of Psychiatry, 78% of the employees were non-white, and 33% were black.  Moreover, as of May 12, 2006, 23.8% of the employees with managerial or supervisory positions in the Department of Psychiatry were black, and black employees supervised by Evdokas and Esteves accounted for 33% and 34.6% of the total employees, respectively.[9]  These statistics evince substantial racial diversity among the employees comparable to Plaintiff and negate any inference of discrimination that otherwise might have been created.  *See, e.g.*, *Carr*, 171 F. Supp. 2d at 308 (plaintiff's theory of inference of age-based discrimination was belied by evidence that almost half of former coworkers were over 40); *Noyer v. Viacom, Inc.*, 22 F. Supp. 2d 301, 307 (S.D.N.Y. 1998) (no inference of sex discrimination where over half of workforce was female).

Moreover, Plaintiff's relationship with Esteves, the alleged discriminator, undercuts any finding of racial animus on his part.  Plaintiff does not dispute that she and Esteves "got along well" and had a good relationship at all times prior to February 2005, and that their relationship began to deteriorate only because of the dispute that arose concerning the best use of grant funds, and had nothing to do with discriminatory animus.  Esteves also gave Plaintiff a positive

---

[8] In her opposition, Plaintiff raises an alternative reason why the conditions of her termination raise an inference of discrimination: namely, that her salary was lower than two employees who are not black.  *See* Plaintiff's Memorandum of Law in Opposition ("Opp.") at 7.  Specifically, Plaintiff claims that Marciano and Ibet Hernandez earned higher salaries and had more rapid pay increases than Plaintiff, and this disparate pay is illustrative of Esteves's unfavorable treatment.  I will not consider Plaintiff's newly asserted claim of discriminatorily unequal pay because, first, Plaintiff's claim is not probative of discriminatory animus. Neither Hernandez nor Marciano was similarly situated to Plaintiff, as both women were employed by a different department and had different responsibilities than Plaintiff.  *See Graham v. Long Island R.R*., 230 F.3d 34, 39 (2d Cir. 2000) (evidence of disparate treatment requires demonstration that employees being compared were "similarly situated in all material respects").  Second, Plaintiff's unequal pay claim is made for the first time in her opposition and contradicts her previous deposition testimony, where she stated that there were no other bases for her discrimination claims.  *See Brown*, 257 F.3d at 252 ("Factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition.").

[9] Plaintiff argues that Defendants should be precluded from presenting demographics evidence relating to managerial employees or employees supervised by Evdokas or Esteves because they had not provided documents to support those statistics.  To the contrary, Magistrate Judge Francis's order dated January 28, 2009 found that Defendants had satisfactorily produced documents and supplemental interrogatory answers on this subject. (Docket # 41).  Alternatively, Plaintiff represented that these demographics are incorrect and that the percentage of black employees in the Department and managerial employees are only 34.8% and 15%, respectively.  However, Plaintiff's figures were arrived at using employment statistics as of August 2008.  *See* Opp. at 8.  To the contrary, the relevant statistics relate to the demographic composition of the workforce at the time of Plaintiff's termination in May 2006.

evaluation in 2002 and she received salary increases in 2002, 2003 and 2005 while under his supervision. Thus, any discriminatory inference is belied by the history of the working relationship between Plaintiff and her alleged discriminator. *See, e.g.*, *Figueroa*, 500 F. Supp. 2d at 236 (finding no inference of discrimination when plaintiff alleged discrimination at the hands of same supervisor who approved plaintiff's promotion).

Finally, Plaintiff also raises a claim under the FCA based on allegations that she was terminated due to her complaints relating to the computers. Plaintiff's argument that she was fired because of her alleged investigation into fraud related to the purchase of the computers clearly undermines her claim here that she was fired because of her race. Under these circumstances, I find that Plaintiff has failed to satisfy her burden to establish a *prima facie* claim of racial discrimination.

### 2. Legitimate Nondiscriminatory Purpose

Even if Plaintiff had successfully established a *prima facie* claim, the burden of going forward would then shift to Defendants to articulate a legitimate nondiscriminatory purpose for her termination. Defendants sufficiently articulate such a legitimate purpose by showing that Plaintiff was terminated for violating the Hospital's "Computer and Other Electronic Equipment Policy." Specifically, Defendants contend that telephone usage audit revealed that during the first quarter of 2006, Plaintiff's extension was among those with the 100 most expensive calls. Indeed, Plaintiff's call log for that period showed that calls were made from her extension in the amount of almost $6,000, over half of which was made up of calls made to Plaintiff's native country of Nevis and to St. Kitts. After being given an opportunity to substantiate the business need for these calls, and having failed to do so, Plaintiff was terminated. Such a violation of Hospital policy is clearly a sufficiently legitimate nondiscriminatory decision for termination. *See Visco v. Community Health Plan*, 957 F. Supp. 381 (N.D.N.Y. 1997) (excessive use of company telephone for personal phone calls sufficient for legitimate nondiscriminatory purpose); *see also Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60 (2d Cir. 1997) (violation of company non-fraternization policy found legitimate nondiscriminatory purpose for plaintiff's termination).[10]

---

[10] Plaintiff argues that Defendants' proffered purpose is precluded by an administrative law judge's determination in her unemployment hearing that her conduct did constitute misconduct. Opp. at 9-10. However, as the U.S. Supreme Court has made plain, the findings of an unreviewed state administrative proceeding have no preclusive effect in federal court on Title VII claims. *See University of Tenn. v. Elliott*, 478 U.S. 788, 796 (1986) ("Congress did not intend unreviewed state administrative proceedings to have preclusive effect on Title VII claims."); *Nestor v. Pratt & Whitney*, 466 F.3d 65, 73 (2d Cir. 2006); *Hernandez v. New York City Law Dep't Corp. Counsel*, No. 94 Civ. 9042 (AJP) (SS), 1997 WL 27047, at *13-16 (S.D.N.Y. Jan. 23, 1997).

I find that Defendants have satisfied their burden to show facts that indicate a legitimate nondiscriminatory reason to terminate Plaintiff. The Plaintiff now has the burden to show that this reason was a pretext for racial discrimination.

### 3. Pretext

A plaintiff alleging employment discrimination may show pretext where "the employer's given legitimate reason is unworthy of credence," *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1113 (2d Cir. 1988), "by reliance on the evidence comprising the prima facie case, without more," *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 28 (2d Cir. 1994), or "by demonstrating that similarly situated employees outside the protected class were treated differently." *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 249 (S.D.N.Y. 2001). Plaintiff's attempt to rely on the same evidence as that on which she relied to establish her *prima facie* claim is necessarily deficient for the same reasons as discussed above, and Plaintiff has come forward with no evidence that any similarly situated non-black employees violated the Hospital's telephone policy but were not terminated. Accordingly, I look to whether Plaintiff has presented any genuine issue to show that Defendants' proffered legitimate business rationale for her termination is not worthy of credence.

First, Plaintiff attempts to present evidence, created after her termination, that the long-distance telephone calls on her call log were made pursuant to the legitimate business purpose of contacting HRP patients in the Caribbean. However, pursuant to Judge Francis's March 25 Order, that explanation is no longer available to Plaintiff. *See supra* note 4.[11] Moreover, while Plaintiff raises the specter of the possibility that others came into her office to use her telephone without her knowledge, she has produced no evidence to support such a claim.

Plaintiff claims that Defendants' "business reason was in reality a subterfuge to terminate Plaintiff's employment." Opp. at 11. However, such unsupported conclusory allegations are insufficient to raise a genuine issue of material fact as to Defendants' articulated legitimate nondiscriminatory purpose for terminating Plaintiff. Moreover, her claim is undermined by the record evidence, which clearly indicates that neither Esteves nor Evdokas had any part in the telephone audit or the investigation of Plaintiff's own telephone records. The undisputed evidence

---

[11] At oral argument, Plaintiff's counsel represented that at least one name on the list of names purportedly showing patients to whom Plaintiff made long-distance calls did accomplish its purpose. Counsel identified a Dr. Kingsley, a physician in Nevis who underwent surgery at the Hospital, and to whom Plaintiff supposedly made phone calls. Contrary to counsel's account, Dr. Kingsley's name does not appear on the list of individuals to whom Plaintiff purportedly made long-distance calls for business purposes. Thus, Plaintiff cannot even point to a single patient she called to substantiate a business purpose for her long-distance calls.

10

shows that the audit and investigation were conducted by Thompson, and that it was Nhambiu who approached Plaintiff and requested substantiation for the calls.

Plaintiff argues that because Defendants refused to turn over telephone records for other managerial employees in her department, the Court should draw an adverse inference and find that the records would have shown similar telephone usage for managers who were not disciplined or terminated. *See* Opp. at 13. Defendants contend that such records no longer exist, per a Hospital policy not to retain telephone records for longer than one year. The Second Circuit has held that the spoliation of evidence "can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107 (2d Cir. 2001). However, "[i]n borderline cases, an inference of spoliation, *in combination with some (not insubstantial) evidence* for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." *Id.* (emphasis added). "The burden falls on the 'prejudiced party' to produce some evidence suggesting that a document or documents relevant to substantiating his claim would have been included among the destroyed files." *Id.* at 108. Here, Plaintiff has produced no evidence whatsoever, beyond pure speculation, that the records would show that other managers similarly abused the telephone policy but avoided discipline or termination. Thus, Plaintiff's spoliation claim is insufficient to save her from summary judgment.

Further, Plaintiff's opposition clearly states that it is her "contention that her [telephone usage] report was generated, not because of expensive calls, but because Esteves was angry that she was inquiring about the location of the missing 8 computers in March 2006." Opp. at 11. Regardless of Plaintiff's support for this claim (which, as discussed in detail below, is scant), it asserts Plaintiff's position that the telephone usage investigation was, if anything, pretext for alleged retaliation based on reporting of FCA violation, and not pretext for racial discrimination.

For all the foregoing reasons, I find that Plaintiff has failed to satisfy her burden to show the existence of any genuine issues of material fact so as to survive summary judgment and that no reasonable jury could find that Defendants terminated her based on racial discrimination.

C.     **Hostile Work Environment Under Title VII and Section 1981**

To defeat a motion for summary judgment on a hostile work environment claim, "a plaintiff must produce evidence that the workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of the victim's employment." *E.g.*, *Patterson*, 375 F.3d at 227. Whether a plaintiff has made her claim is to be based on the totality of the circumstances; courts generally look to factors such as

11

the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). The inquiry has both objective and subjective elements. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so").

"[M]ere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21. Accordingly, "[f]or racist comments, slurs and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997); *id.* at 110-11 ("[W]hether racial slurs constitute a hostile work environment typically depends on the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment."). Thus, "[i]solated incidents or episodic conduct will not support a hostile work environment claim." *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999). However, the Second Circuit has recognized that "[t]here is neither a threshold 'magic number' of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." *Id.* at 439.[12]

Here, the only conduct that Esteves is alleged to have taken that have any racial overtones was the use of the expression "black ass" to refer to Plaintiff on three occasions. While there is no doubt that such conduct in the workplace is offensive and inappropriate, Plaintiff has not shown sufficient evidence to support a claim that it was so "pervasive and severe" so as to alter her employment conditions for the worse. *See, e.g.*, *Negron v. Rexam Inc.*, 104 Fed. Appx. 768, 770 (2d Cir. 2004) (co-worker's use of racial epithet "on a handful of occasions . . . including once over the loud-speaker" was insufficient to establish hostile work environment). Even considering these comments in the context of Esteves's other alleged conduct, such as ignoring Plaintiff, monitoring her whereabouts, etc., the evidence merely shows that Esteves did not treat her well; it

---

[12] Plaintiff relies on *Richardson* in support of her hostile work environment claim; however, *Richardson* is distinguishable. In that case, the Second Circuit enumerated an extensive litany of racial slurs and offensive references and jokes that it found sufficient for a reasonable juror could find the plaintiff's work environment altered for the worse. *See* 180 F.3d at 439 (plaintiff and other black employees referred to as "niggers," "apes and baboons," "spooks," and "Buckwheats" on numerous occasions). While "the appalling conduct alleged in prior cases should not be taken to mark the boundary of what is actionable," *id.*, at the very least it cannot be said that the facts in *Richardson* are similar to those in this case.

does not, however, rise to the level necessary to make out a hostile work environment claim.[13] Federal courts are not, and should not be, in the business of imposing strictures of propriety on employers where there is no racial animus – "[o]therwise, the federal courts will become a court of personnel appeals." *Alfano*, 294 F.3d at 377; *see also Faragher*, 524 U.S. at 788 ("These standards . . . are sufficiently demanding to ensure that Title VII does not become a general civility code.").

Plaintiff contends that Esteves's conduct is all the worse because he is her supervisor. While true that a supervisor's use of a racial epithet is more degrading and has greater effect on an employee than the same comments made by an equal, such a characterization does not save Plaintiff's hostile work environment claim. Even though Esteves was Plaintiff's supervisor, his conduct alone, and that's all there is, did not rise to the level necessary to maintain her claim. Courts in this Circuit frequently find summary judgment appropriate even where the offensive conduct was carried out by a supervisor. *See, e.g.*, *Lewis v. City of Buffalo Police Dep't*, No. 07-5719-cv, 2009 U.S. App. LEXIS 3389, at *8 (2d Cir. Feb. 20, 2009) (supervisor occasionally referring to plaintiff in vulgar or derogatory names was insufficient to support hostile work environment claim); *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58-59 (2d Cir. 2004) (affirming summary judgment on hostile work environment claim where supervisor threatened to transfer plaintiff and wrote her up for minor disciplinary infractions after she refused to have sex with him); *Khan v. Abercrombie & Fitch, Inc.*, 35 F. Supp. 2d 272, 277 (E.D.N.Y. 1999) (allegation that supervisor once called the plaintiff a "black bitch" found insufficient to give rise to hostile work environment).

In sum, Plaintiff has failed to shoulder her burden to demonstrate either that a single incident was extraordinarily severe, or that the three identified remarks upon which Plaintiff relies were sufficiently continuous in nature to have altered the conditions of her work environment. *See Whidbee v. Garzarelli Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000). Accordingly, summary judgment on Plaintiff's hostile work environment claims is appropriate.[14]

---

[13] While facially neutral incidents may of course be included in the "totality of the circumstances" inquiry, Plaintiff must produce evidence to allow a reasonable jury to find that the neutral incidents were based on an impermissible rationale, such as race. *See Richardson*, 180 F.3d at 440; *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002).

[14] Defendants also argue that Plaintiff's failure to take advantage of the Hospital's discrimination policy is an "absolute defense" to a hostile work environment claim. However, the Supreme Court has held that this defense does not apply "when the supervisor's harassment culminates in a tangible employment action, such as discharge." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *see also Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001). As it is undisputed that Plaintiff was terminated, the defense is not available in here.

**D.     False Claims Act Claim**

The Second Circuit has held that "to impose liability under the [FCA], [a plaintiff] must show that defendants (1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001).  Section 3730(h) of the FCA provides a right of action to whistleblower employees who are discharged, demoted or harassed for actions taken "in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under [the Act]." *See Moor-Jankowski v. Board of Trs. of New York Univ.*, No. 96 Civ. 5997 (JFK), 1998 WL 474084, at *10 (S.D.N.Y. Aug. 10, 1998).  Plaintiff claims that her FCA claim arises under § 3730(h), based on her complaints regarding Esteves's use of HRP grant funds to purchase computers.  To sustain her claim under § 3730(h), Plaintiff must prove that (1) she engaged in conduct protected under the statute; (2) Defendants were aware of her conduct; and (3) she was terminated in retaliation for her conduct. *Id.*; *see also United States ex rel. Ellis v. Sheikh*, 583 F. Supp. 2d 434, 439 (W.D.N.Y. 2008).

On the first element of her claim, Plaintiff "must demonstrate that her investigation, inquiries, and/or testimony were directed at exposing a fraud upon the government." *Moor-Jankowski*, 1998 WL 474084, at *10.  Thus, "[f]or an employee's actions to be protected they must have been in furtherance of an action under the FCA." *Faldetta v. Lockheed Martin Corp.*, No. 98 Civ. 2614 (RCC), 2000 WL 1682759, at *12 (S.D.N.Y. Nov. 9, 2000); *see also McAllan v. Essen*, 517 F. Supp. 2d 672, 685 (S.D.N.Y. 2007) ("The inquiry as to whether an employee engaged in protected conduct involves determining whether an employee's actions sufficiently furthered an action filed or to be filed under the FCA . . . .").  Although Plaintiff now asserts that she was motivated by such a belief, there is little, if anything, in the record to indicate that she was concerned with anything more than the best use of grant funds, or that she was merely upset because Esteves went behind her back and used the funds for a purpose of which she disapproved.  She supports her arguments only with conclusory statements, such as she "suspected this order [for the computers] was suspicious because they were ordered without her consent," and when she was informed that the eight "missing" computers were located at the Hospital's facility at 1276 Fulton Street, she "knows that 1276 Fulton Street is a large hospital facility and since no specific location was indicated by Esteves, this was simply a smoke screen." Opp. at 22-23.  These unsupported allegations are insufficient to raise a genuine issue of material fact as to whether Plaintiff had attempted to ferret out fraud relating to the purchase of the computers.

Moreover, Plaintiff's October 2005 memo to Dr. Levine, which counsel has represented is the *only* complaint on which she relies to show her "protected activity" under the FCA, does not rise to the level of investigative activities in furtherance of an FCA claim.  In that memo, Plaintiff complained that she had objected to the use of HRP grant funds for the purchase of computers and that Esteves had purchased the computers without her consent.  There is nothing in the memo that remotely suggests Plaintiff believed the purchase orders for the computers had been fraudulent.  Indeed, Plaintiff's memo concedes that she had actually received four of the twelve computers in the HRP, and that she was simply not advised of the location of the other eight computers.  Thus, Plaintiff has failed to satisfy her burden on the first element of her FCA claim.

Even if Plaintiff could establish that she had engaged in protected activity, she must also show Defendants knew she had engaged in that conduct.  "Absent such notice, then, *a fortiori*, [Defendants'] actions could not constitute retaliation."  *Faldetta*, 2000 WL 1682759 at *13; *see also United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996) ("[U]nless the employer is aware that the employee is investigating fraud, the employer could not possess the retaliatory intent necessary to establish a violation of § 3730(h).").  Plaintiff argues that a jury could find it plausible that Dr. Levine reported to Esteves that Plaintiff had relayed her concerns related to the so-called "missing" computers and that Esteves "attempted to cover his tracks."  Plaintiff offers no evidence to support this claim.  Therefore, Plaintiff likewise fails to raise a genuine issue of material fact as to the second element of her FCA claim.

Finally, to satisfy her FCA claim, Plaintiff must show "that [Defendants'] retaliatory actions resulted 'because' of [her] participation in a protected activity."  S. Rep. No. 345, 99th Cong., 2d Sess. 35 (1986), *reprinted in*, 1986 U.S.C.C.A.N. 5266, 5300.  When an employer produces sufficient evidence to show a legitimate reason for a plaintiff's termination, there is no causal connection between allegedly protected activities and termination.  *See Faldetta*, 2000 WL 1682759 at *13.  Here, as discussed in detail above, Defendants have shown sufficient evidence of a legitimate reason for Plaintiff's termination – *i.e.*, her violation of the Hospital's telephone usage policy.  Moreover, Plaintiff has not demonstrated a temporal proximity between her allegedly protected activity and the allegedly retaliatory conduct.  *See McAllan*, 517 F. Supp. 2d at 686.  The only "protected action" to which Plaintiff has pointed is her October 2005 memo; yet, Plaintiff was not terminated until May 12, 2006, nearly seven months later.  Plaintiff has thus failed to provide any evidence that would allow a reasonable jury to find a nexus between the complaint and her termination.  Accordingly, summary judgment as to Plaintiff's FCA claim is granted.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of this Court shall enter judgment in favor of the Defendants, close all open motions and remove this matter from my docket.

**IT IS SO ORDERED.**
**New York, New York**
**April 2, 2009**

_____
U.S.D.J.